UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHLIMON SHLIMON,

               Plaintiff,                                Civil Action No. 4:12-13806

       v.                                   District Judge Terrence G. Berg
                                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

## REPORT AND RECOMMENDATION TO
## GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]

In September 2001, Plaintiff Shlimon Shlimon was injured in a motor vehicle accident. (Transcript ("Tr.") 206.) Although he started experiencing back pain soon thereafter, he continued to work as a cashier until August 2008. (Tr. 40.) At that point, Shlimon avers, his pain became too much to continue working. (*See* Tr. 43-44.) He thus applied for disability insurance benefits and supplemental security income. (*See* Tr. 23.) The Defendant Commissioner of Social Security denied these applications. (Tr. 1.) Shlimon now appeals to this Court. (*See* Dkt. 1, Compl.)

Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 12). As detailed below, the ALJ failed to adequately articulate why he rejected the opinion of Shlimon's treating physician, Dr. Terri Steppe. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

In September 2008, Shlimon applied for disability insurance benefits and supplemental security income asserting that he became unable to work on August 27, 2008.  (Tr. 23.)  The Commissioner of Social Security ("Commissioner") initially denied these applications in July 2009. (Tr. 23.)  Shlimon then requested an administrative hearing, and in August 2010, he appeared, with counsel, before Administrative Law Judge ("ALJ") Roy Roulhac, who considered his case *de novo*. (Tr. 34-62.)  In a September 28, 2010 decision, ALJ Roulhac found that Shlimon was not disabled within the meaning of the Social Security Act.  (*See generally* Tr. 23-30.)  His decision became the final decision of the Commissioner of Social Security on July 26, 2012, when the Social Security Administration's Appeals Council denied Shlimon's request for review.  (Tr. 1.)  Shlimon filed this suit on August 28, 2012.  (Dkt. 1, Compl.)

### B. Medical Evidence

#### 1. Treatment Prior to the Alleged Disability Onset Date

In September 2001, Shlimon was traveling around 40 miles per hour when a car turned out in front of him, resulting in a collision.  (Tr. 206.)  He went to the emergency room, where he was diagnosed with chest and hip contusions, a dental fracture, and a right-leg strain.  (Tr. 207.)

In January 2002, Shlimon sought treatment for back pain at Rehabilitation Specialists of Monroe.  Dr. Terry Samuels diagnosed Shlimon with a lumbar strain, probable vertebral disc disease, sacroiliac joint dysfunction, and a cervical strain.  (Tr. 233.)  He prescribed Vicodin and ordered an EMG to test for lumbar radiculopathy.  (Tr. 233.)  The EMG study, performed in February, revealed "mild [right] L4 or L5 radiculopathy vs. isolated [right] [illegible] damage

2

(mild)." (Tr. 228.)

In March 2002, Dr. Samuels reviewed the EMG. (Tr. 230.) He diagnosed Shlimon with a lumbar strain, radiculopathy, and questionable vertebral disc disease. (*Id.*) Dr. Samuels ordered an MRI. (*See* Tr. 233.)

In November 2002, Dr. Samuels authored the first of what would become several letters from Shlimon's medical providers to an attorney, Peter Fales, who represented Shlimon in legal proceedings arising out of the September 2001 auto accident. (Tr. 235.) Dr. Samuels informed Fales that the MRI "demonstrate[d] a shallow left foraminal disc protrusion at L3-L4 and an effacing ventral perineural fat of the traversing L3 nerve root." (Tr. 235.) He provided that Shlimon's diagnoses were "vertebral disc disease and . . . lumbar radiculopathy, as well as facet arthropathy, and multiple somatic dysfunctions." (*Id.*) He noted that Shlimon needed to see a neurosurgeon, and that a final prognosis would "hinge" upon a neurosurgical evaluation. (*Id.*) For financial or insurance-coverage reasons, Shlimon never underwent the evaluation. (*See* Tr. 350.)

The administrative record contains very few medical records between November 2002 and April 2007. In January 2005, Dr. Paul Emerson noted that Shlimon was doing fine on his medications. (Tr. 212.) Shlimon was then taking Vicodin for pain, Soma for muscle spasms, and Xanax for anxiety. (Tr. 212.) Dr. Emerson's diagnoses were herniated nucleus pulposus and lumbar radiculitis. (*Id.*) In June 2005, Shlimon told Dr. Emerson that there was "no change" in his pain. (Tr. 216.)

In April 2007, Shlimon returned to Rehabilitation Specialists of Monroe, and for the next three years, he treated almost exclusively with one physician at that facility: Dr. Terri Steppe. (*See* Tr. 242-324, 350-60.) Shlimon told Dr. Steppe that his lower-back pain radiated into his legs and

his left testicle and that he could not find a comfortable position.  (Tr. 242.)  Shlimon further told

Dr. Steppe that on bad days his pain spread to his thoracic region, which made it difficult to breathe.

(*Id.*)  Dr. Steppe diagnosed lumbar radiculopathy and facet syndrome.  (*Id.*)  She noted that Shlimon

needed a new MRI (because the prior one was four years old) but Shlimon lacked the necessary

insurance coverage.  (*Id.*)  In late April 2007, Dr. Steppe scheduled Shlimon to see Dr. Bruce

Hirschman (another physician at Rehabilitation Specialists of Monroe) for pain management.  (Tr.

245, 249.)

   After some delay due to financial constraints (Tr. 246), Shlimon saw Dr. Hirschman several

times during the summer of 2007.  In late June, Dr. Hirschman advised that narcotics should be used

as an adjunct to back management, physical therapy, and osteopathic manipulative treatment.  (Tr.

249.)  (It appears that all the physicians at Rehabilitation Specialists are doctors of osteopathic

medicine.  (*See* Tr. 350.))  He prescribed Elavil as a sleep aid and MS Contin.  (Tr. 249.)  The next

month, Shlimon reported that his back pain persisted, and Dr. Hirschman noted the need for an

updated MRI.  (Tr. 250.)  In August 2007, Shlimon reported that MS Contin made him vomit.  (Tr.

252.)  Shlimon also requested to return to Dr. Steppe as he felt that, for a day at least, osteopathic

manipulation improved his pain.  (*Id.*)

   At a September 2007 appointment with Dr. Steppe, Shlimon reported that his pain averaged

an eight on a ten-point scale.  (Tr. 255.)  Dr. Steppe noted that Shlimon's evaluation and treatment

had been delayed due to insurance and financial constraints.  (Tr. 254.)

   In October 2007, Dr. Steppe wrote Fales (Shlimon's auto-accident attorney) for help in

obtaining a new MRI.  (Tr. 350.)  Her letter explained, "[u]ntil [Mr. Shlimon] is able to afford this,

we are managing his pain with osteopathic manipulation and Lorcet . . . .  This is not adequate

4

treatment at this time, but no further decisions can be made until further testing has been done."
(*Id.*)

This theme continued. In January 2008, Dr. Steppe examined Shlimon and found that he had muscular tension throughout his thoracic and lumbar spine. (Tr. 265.) Shlimon was taking Lorcet for pain and Neurontin at night. (*Id.*) Shlimon planned to pay for the MRI with his tax refund, but Dr. Steppe questioned the usefulness of the study as Shlimon would not be able to afford the follow-up treatment. (*Id.*) Dr. Steppe noted in February: "still [no] word from [his] lawyer[;] [Mr. Shlimon] is looking for [a] new one." (Tr. 268.) And in March: "encouraged [Mr. Shlimon] to pursue his lawyer or find a new one." (Tr. 272.) In April Dr. Steppe provided Shlimon with the phone number for financial assistance at "Mercy," apparently referring to Mercy Memorial Hospital where Shlimon was initially treated for his auto-accident injuries. (Tr. 274.) Shlimon had also made an appointment with a new lawyer. (*Id.*) Later that month, however, Shlimon told Dr. Steppe that he had not seen the new lawyer because the drive was too far. (Tr. 277.) Shlimon also had not looked into the financial assistance that Dr. Steppe had recommended; Dr. Steppe renewed that recommendation. (*Id.*) By May, Shlimon still had not looked into the recommended financial assistance and had not found a new lawyer. (Tr. 279.) Dr. Steppe again "encouraged [patient] to follow [through] [with] seeking financial assistance [at] hospital." (*Id.*)

### 2. Treatment After the Alleged Disability Onset Date

In late August 2008, presumably on or around the alleged disability onset date of August 27, 2008, Shlimon fell onto his left side; this exacerbated his back pain. (Tr. 290; *see also* Tr. 294.) In September 2008, Dr. Steppe noted that Shlimon had not worked since his fall in August. (Tr. 290.) Shlimon was waiting for a court hearing on his insurance claim, scheduled for January 2009. (*Id.*)

Dr. Steppe again recommended that Shlimon apply for financial assistance through the hospital, but noted, "again today, [Mr. Shlimon] does not wish to pursue this."  (*Id.*)  Dr. Steppe refilled Shlimon's Lorcet prescription and prescribed Restoril, an insomnia medication.  (*Id.*)

The next month, Dr. Steppe completed a form titled "Spine and Pain: Exam of the Low Back."  (Tr. 292.)  She provided that Shlimon's gait was antalgic on the right.  (*Id.*)  According to Dr. Steppe, Shlimon's range of movement was abnormal and he had bilateral lumbar paraspinal "tenderness/spasm/somatic dysfunction."  (*Id.*)  Both straight-leg and "Patrick" tests were positive. (*Id.*)

On November 7, 2008, Dr. Steppe wrote another letter to Fales.  (Tr. 358.)  She summarized Shlimon's condition this way:

> Clinically, aside from significant gait and postural abnormality due to pain, Mr. [Shlimon] demonstrates decreased muscle strength throughout the entire right lower extremity as well as in the left quadriceps and tibialis anterior muscles.  He also has decreased sensation in the L4-5 distribution on the right. . . .
>
> At this point[,] further evaluation is necessary before treatment options can be identified.  He will require new MRI and EMG testing to identify any changes that may have developed in the 6 years since his previous testing. . . .
>
> Unfortunately, given the severity of his injury, I believe that even with proper treatment this will result in permanent disability for [Mr. Shlimon].

(Tr. 358.)

By November 2008, Shlimon's increased back pain from the August 2008 fall had resolved and his pain had returned to pre-fall levels.  (Tr. 294.)  The next month, Dr. Steppe noted, "still has not been able to return to work—[he] may try soon."  (Tr. 297.)  Shlimon was taking Soma (for sleep) and Vicodin three times a day.  (*Id.*)

6

Although Shlimon's lawsuit had not settled, in February 2009 "they" agreed to pay for Shlimon's MRI.  (Tr. 299.)  Dr. Stephen Blum performed the MRI and provided that Shlimon's central canal and neural foramina were normal from T11 down through S1.  (Tr. 301.)  He further interpreted "[n]ormal lumbar lordosis without spondylolisthesis [i.e., a slipped disc due to a stress fracture] or spondylolysis [i.e., stress fracture]."  (*Id.*); *Spondylolysis and Spondylolisthesis*, Am. Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/ topic.cfm?topic=a00053 (last visited May 2, 2013).  Dr. Blum's "impression" was "no disc protrusion[s]" and "relatively minor multilevel spondylosis."  (Tr. 302.)[1]  He did note, however, that the MRI revealed a "posterior subligamentous disc tear lateralized to the left . . . which may contribute to clinical symptoms."  (Tr. 301.)

On February 12, 2009,  Dr. Steppe informed Fales of the recent findings:

> Now finally, we have the new MRI.  This shows multi-level degenerative changes similar to the . . . study [from 2002] and a new mention of a tear in the L5-S1 disc.  The lack of mention of this tear on the MRI from 2002 could suggest that [it] is new, or it could be due to either the improved quality of the current study . . . or the fact that the recent study was read by a neuroradiology specialist.  At any rate, I believe that [the tear] is a component in Mr. [Shlimon's] ongoing pain.

(Tr. 356.)  Although Dr. Steppe intended to refer Shlimon for a neurosurgical evaluation, she concluded her letter by acknowledging, "[o]f course any next step in evaluation or treatment will be dependent on Mr. [Shlimon] receiving the coverage that he deserves and needs so I will await your response before proceeding with a referral."  (Tr. 357.)

---

[1] "Spondylosis refers to degenerative changes in the spine such as bone spurs and degenerating intervertebral discs. Spondylosis changes in the spine are frequently referred to as osteoarthritis." Dr. Catherine Driver, Emedicinehealth Website, http://www.emedicinehealth.com/ spondylosis/article_em.htm (last visited Apr. 29, 2013).

In April 2009, Dr. Steppe noted that there was still no word from Fales regarding the recent hearing. (Tr. 307.) Shlimon reported that his back pain had improved 20 percent due to the warmer weather. (*Id.*) Dr. Steppe noted that Shlimon mainly kept his weight on his right lower extremity because the left fatigued easily. (*Id.*)

In May, Shlimon reported that he had no pain in the mornings, but his pain gradually increased to an eight-out-of-ten by the end of the day. (Tr. 308.)

Shlimon's symptoms and treatment did not significantly change in the summer of 2009. In June, Dr. Steppe noted that there was still no word from Fales. (Tr. 309.) Dr. Steppe referred Shlimon to "disability lawyer (Elizabeth Warren)." (*Id.*) In July Dr. Steppe spoke with Fales, who reported that Shlimon's case had been "on the back burner." (Tr. 310.) In August, Shlimon continued to complain of his "usual low back pain"; Dr. Steppe recommended that Shlimon establish a primary-care physician. (Tr. 311.) Shlimon was then taking Lorcet and Soma for his pain. (Tr. 312.)

In 2010, Dr. Steppe continued to be largely unsuccessful in getting Shlimon financial coverage for further medical treatment. In February, Dr. Steppe encouraged Shlimon to pursue medical coverage through Medicaid or the Monroe County Health Plan. (Tr. 319.) She also provided Shlimon with information regarding a new lawyer for his auto-accident litigation. (Tr. 320.) At the February 2010 appointment, Dr. Steppe observed that Shlimon stood "bow legged" and held the wall for support. (Tr. 319.) And Shlimon's waist range-of-motion was less than 10 degrees in all planes. (*Id.*) In April 2010, Shlimon underwent a neurosurgical evaluation. (Tr. 322.) The consult did not recommend surgery. (*Id.*) The next month, Dr. Steppe noted, "[Mr. Shlimon] [h]as not seen Dr. Abdu Chakra nor has he looked into financial assistance as discussed [at] the last

visit. . . .  Also [he] has never established [with a primary care physician] in spite of providing info

[regarding] assistance." (Tr. 323.)  Dr. Steppe again encouraged Shlimon to follow up on obtaining

financial assistance.  (*Id.*)   In June 2010, however, Dr. Steppe remarked, "[Mr. Shlimon] still has

not looked into financial assistance, so [there is no] further evaluation or possibility for [treatment]."

(Tr. 324.)

On July 30, 2010, Dr. Steppe completed a functional assessment form.  (Tr. 351-55.)  She

provided that Shlimon experienced extraordinary fatigue and pain; in an eight-hour workday, he

could only stand or walk for a total of two hours and only sit for a total of two hours; he could not

lift or carry more than five pounds; and he could never bend at the waist or crouch.  (Tr. 351-52.)

Dr. Steppe opined that Shlimon would need to miss work more than four times per month because

of his impairments or treatment.  (Tr. 355.)  She also provided that Shlimon's pain and fatigue were

significant enough to affect his mental functioning, including causing a moderate impairment in his

ability to maintain attention and concentration for at least two straight hours, four times in a

workday.  (Tr. 353.)   Dr. Steppe explained, "I have witnessed a marked difference in [Mr.

Shlimon's] mood between early or late-in-the-day appointment[s].  There is obvious [increased]

fatigue and irritability later in the day." (Tr. 354.)  According to Dr. Steppe, all of these limitations

had existed since the alleged onset date of August 27, 2008.  (Tr. 355.)

A few days later, Dr. Steppe wrote a letter to Warren, then Plaintiff's social security attorney.

(Tr. 359.)  She explained,

> The nature of [Mr. Shlimon's] pain and his limitations are outlined
> in the forms that you sent for me to complete, but these do not fully
> explain the extent of his disability.  Most obvious is the extreme
> muscle tension and the stiff manner in which he carries himself.  This
> limits the range of motion at his waist to less than 10 degrees in all
> planes due to the pain and tension.  While he does not use a cane for

9

> ambulation, he is always walking so that he can place one hand along furniture or along the wall for added support. In standing, the majority of his weight is over the left lower extremity so he can avoid exacerbation of the pain he experiences in the right lower extremity. All of this makes it difficult to sit or stand greater than 15 minutes which makes it impossible for the patient to work even part-time.
>
> Up to this point, the main treatment has been pain management with osteopathic manipulation and medication. . . .  Recently, I was able to obtain a neurosurgical evaluation and at this point they do not feel that he is a surgical candidate.  They did recommend physical therapy and this has been my recommendation as well, but again the patient is unable to afford this.   At this point, his monthly visits for osteopathic manipulation and medication refills have been keeping him at least functional in his daily activities.

(Tr. 359.)  Dr. Steppe concluded by opining on Shlimon's credibility:

> I would specifically like to add that in no time during my acquaintance with Mr. Shlimon have I ever felt that there was any malingering, nor has there ever been any evidence of abuse of medications. I truly believe that Mr. Shlimon is in a significant amount of pain as the result of the injury he received in a motor vehicle accident.

(*Id.*)

### 3.  Evaluations and Opinions at the Direction of the Social Security Administration

In April 2009, Dr. Gayle Oliver-Brannon, a limited licensed psychologist, performed a consultative evaluation for Michigan's Disability Determination Service.  (Tr. 176-81.)  Shlimon told Dr. Oliver-Brannon about his panic attacks, feelings of hopelessness and worthlessness, crying spells, and irritability.  (Tr. 176.)  She observed that Shlimon's mood was dysphoric and his thought content depressive.  (Tr. 177.)  During the mental status exam, Shlimon was able to immediately recall six out of seven numbers (in the forward direction), but could only remember one out of three objects after three minutes.  (Tr. 178.)  On the "serial sevens" test, a concentration test requiring repeated subtraction of seven starting from 100, Shlimon answered, "93, 86, 79, 72."  (Tr. 178.) Dr.

Oliver-Brannon diagnosed depressive disorder, not otherwise specified and panic disorder without agoraphobia. (Tr. 178.) She assigned Shlimon a Global Assessment Functioning score of 48. (Tr. 179.) (A Global Assessment Functioning ("GAF") score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *DSM-IV* at 34.)

A few days later, James Tripp, Ed. D., reviewed Shlimon's medical file and completed both a Mental Residual Functional Capacity Assessment form ("Mental RFCF") and a Psychiatric Review Technique form ("PRTF"). (Tr. 182-89.) On the Mental RFCF, Tripp provided that Shlimon was "[m]oderately" limited in his ability to understand, remember, and carry out detailed instructions and in his ability to respond appropriately to changes in the work setting. (Tr. 182-83.) He also opined, however, that Shlimon's mental capacity was otherwise "[n]ot [s]ignificantly [l]imited." (*Id.*) In a section called "Functional Capacity Assessment," Tripp concluded that Shlimon was "able to do simple, sustained, unskilled tasks with persistence." (Tr. 184.) On the PRTF, Tripp provided that Shlimon had "[m]ild" limitations in activities of daily living and maintaining social functioning, "[m]oderate" difficulties in concentration, persistence, or pace, and no episodes of decompensation. (Tr. 196.)

Shlimon also underwent a physical consultative exam for Michigan's DDS in April 2009. (Tr. 200-01.) Dr. Tanvir Qureshi found that Shlimon ambulated with "some" pain and discomfort and was "slightly" uncomfortable getting onto the examination table. (Tr. 201.) Dr. Qureshi found

11

that Shlimon's lumbar spine movement was "painful and limited": forward flexion to 40 degrees, extension to 5 degrees, rotation to the right 5 degrees and to the left 20 degrees. (*Id.*) Dr. Qureshi's impression was "[c]hronic low back pain with possibility of disc disease." (*Id.*)

### C.  Testimony at the Hearing Before the ALJ

Shlimon primarily testified to "severe" lower back pain during his August 2010 administrative hearing before ALJ Roulhac. (Tr. 44.) Shlimon rated his pain on a typical day to be a "seven" or "eight" on a ten-point scale, but later clarified that his medication typically reduced his pain to about a five or six. (Tr. 45-46.) He explained that when he suffered a spasm, however, his pain spiked to 10. (Tr. 46.)

Functionally, Shlimon testified that he could stand for only about 10 to 15 minutes. (Tr. 54.) He also stated that he could sit for about a half hour, but could do so only three times in an eight-hour period. (Tr. 55, 59; *but see* Tr. 50 (stating 15 to 20 minutes).) When the ALJ asked Shlimon what he did on a typical day, Shlimon responded: "Nothing . . . . Mostly lay down on my back." (Tr. 47.)

The ALJ also solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations that the ALJ believed approximated Shlimon's. Specifically, the ALJ asked the expert to consider a hypothetical person limited to "sedentary" exertion; 10 pounds of lifting; six hours of sitting and two hours of walking with the option of standing for 10 to 15 minutes at a time and then sitting 30 minutes at a time; "occasional[]" ramp and stair climbing, balancing, stooping, kneeling, crouching, and crawling; no unprotected heights; and "unskilled" work. (Tr. 57.) The vocational expert testified that the individual could perform "clerical handling . . . jobs such as document preparers, collators, and stuffers,"

"inspector/checker/sorter jobs," "assembler of various sorts as a bench hand," and "security services jobs as a security monitor and/or receptionist." (*Id.*) Without defining the geographic region, the vocational expert stated there would be a total of 11,000 such jobs. (Tr. 57.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

13

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Roulhac applied the above framework and found that Shlimon was not disabled. At step one, he found that Shlimon had not engaged in substantial gainful activity since the alleged disability onset date of August 27, 2008. (Tr. 25.) At step two, he found that Shlimon had the following severe impairments: "depression, anxiety, and chronic lower back pain with lumbar radiculopathy." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 26.) Between steps three and four, the ALJ determined that Shlimon had the residual functional capacity to perform:

> a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) reduced by the following limitations and restrictions: lift no more than 10 pounds but primarily objects not larger or weighing more than small tools; sit 6 hours, walk two hours; sit/stand option at will; stand 10-15 minutes; sit for 30 minutes; occasionally climb steps and ramps, balance, stoop, kneel, crouch and crawl; avoid unprotected heights; and unskilled work.

(Tr. 26-27.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 29.) At step five, the ALJ found that sufficient jobs existed in the regional economy for someone of Shlimon's age, education, work experience, and residual functional capacity. (Tr. 29-30.) The ALJ therefore concluded that Shlimon was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, September 28, 2010. (Tr. 30.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.

15

2001).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).   Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass*, 499 F.3d at 509;  *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff's primary claim of error is that ALJ Roulhac failed to satisfy the articulation requirement associated with the treating-source rule:  "the ALJ essentially rejected the majority of Dr. Steppe's opinion without proper evaluation or reasoning as required under the treating source rule."  (Pl.'s Mot. Summ. J. at 4.)  While the issue is closer than Plaintiff suggests, the Court ultimately agrees that the ALJ's explanation for discounting Dr. Steppe's opinion falls short of the Administration's requirements.

As a general rule, the opinions of a claimant's treating physicians should be given more weight than those of non-treating physicians because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In fact, if the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," then an ALJ must give the opinion "controlling" weight.  20 C.F.R. §§ 404.1527(c)(2) 416.927(c)(2);  *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  And when an ALJ does not accord the treating physician's opinion controlling weight, he must consider

16

the following non-exhaustive list of factors to determine how much weight to assign the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the supportability of the treating-source opinion, (4) the "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

More important to Plaintiff's appeal is that the treating-source rule includes a procedural requirement that an ALJ provide "good reasons" for the weight assigned to a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. The purpose for this explanatory requirement is three-fold: (1) "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied," (2) to "ensure[] that the ALJ applies the treating physician rule," and (3) to "permit[] meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural right is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Wilson*, 378 F.3d at 544.

As an initial matter, ALJ Roulhac's explicit reason for discounting Dr. Steppe's opinion, that her opinion was "not supported by the objective medical evidence," is questionable. (Tr. 28.) To reach this conclusion, he reasoned,

> Dr. Steppe made reference to a February 2009 MRI showing multilevel degenerative disc disease and [a] torn disc at L5-S1 and an

17

> EMG from 2002 showing lumbar radiculopathy. However, the MRI
> [report] found at Exhibit 7F/82 [(Tr. 301)] shows[] . . . "no disc
> protrusion" and only "relatively minor multilevel spondylosis".
> There was no report of nerve root impingement or stenosis that could
> substantiate the complaints of radiculopathy. The MRI is not fully
> consistent with the severity of the alleged limitations or the intensity
> of the pain.

(Tr. 28.) But this rationale overlooks the fact that Dr. Steppe believed that the disc tear identified

in the MRI report was "a component in Mr. [Shlimon's] ongoing pain." (Tr. 365.) In fact, the

author of the MRI report, Dr. Blum, provided that the tear "may contribute to clinical symptoms."

(Tr. 301.) So, while the ALJ focused on the negative and "mild" findings in the MRI, it is not clear

why the identified disc tear was not "objective medical evidence" supporting Dr. Steppe's opinion.

In addition, the 2002 EMG showed lumbar radiculopathy.

　　　Assuming, however, that the ALJ's rationale allows the Court and Plaintiff to understand

why he did not give Dr. Steppe's opinion "controlling" weight, it does not necessarily follow that

it also adequately explains how much weight the ALJ assigned to her opinion and the reasons for

that weight. "[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of

a treating physician is entitled to great deference, its non-controlling status notwithstanding."

*Rogers*, 486 F.3d at 242. Indeed, the Administration's own rules provide:

> Adjudicators must remember that a finding that a treating source
> medical opinion is not well-supported by medically acceptable
> clinical and laboratory diagnostic techniques or is inconsistent with
> the other substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the opinion
> should be rejected. Treating source medical opinions are still entitled
> to deference and must be weighed using all of the factors provided in
> 20 CFR 404.1527 and 416.927.

S.S.R. 96-2p, 1996 WL 374188, at *4. As discussed, the ALJ focused solely on the absence of

"objective evidence" supporting Dr. Steppe's opinion. It therefore appears that he did not proceed

18

to the second step of the treating-source analysis in violation of the treating-source rule.

The Court, however, is mindful that the regulations only require an ALJ to "apply," 20 C.F.R. § 404.1527(c), or "consider," *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011), the factors set forth at 20 C.F.R. § 404.1527 rather than explicitly discuss each one in his narrative. *See Tracy v. Comm'r of Soc. Sec.*, No. 11-15107, 2012 WL 3542477, at *11 (E.D. Mich. July 13, 2012), *report and recommendation adopted*, 2012 WL 3542460 (E.D. Mich. Aug. 16, 2012). And the Court also acknowledges that in some cases, one or two "good" reasons will suffice to allow the Court and the claimant to understand both why the ALJ assigned the particular weight to the opinion and that the ALJ applied the two-step treating-physician analysis. *See, e.g*, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) ("While this stated reason may be brief, it reaches several of the factors that an ALJ must consider when determining what weight to give a non-controlling opinion by a treating source."). Additionally, in still fewer cases, an ALJ might comply with the aims of the explanatory requirement even if technically violating the rule. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("[T]he procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006) ("We take the opportunity to note . . . that this is a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter.").

Reading the ALJ's narrative more generously then, the Court can reasonably infer that the ALJ implicitly attacked Dr. Steppe's opinion while explaining why he was discounting Plaintiff's

credibility:

> The claimant has not required surgical intervention and his treatment
> has been conservative in nature. The claimant's treating physician,
> Terri Steppe, M.D., acknowledged that a neurosurgical consultant
> evaluation indicated that the claimant was not a surgical candidate.
> This suggests that the claimant's pain and symptoms were not as
> severe as alleged.

(Tr. 28.) The ALJ's reference to Plaintiff's "conservative" treatment history, and to the fact that

surgery was not recommended, goes to both the supportability and consistency factors that an ALJ

must consider when weighing a treating-source opinion that is not entitled to controlling weight.

20 C.F.R. § 404.1527(c)(3), (c)(4).

Still, the Court is not convinced that the goals of the procedural aspect of the treating-source

rule—to let claimants understand the disposition of their cases, to ensure that the ALJ applies the

treating-physician rule, and to permit meaningful appellate review—have been met in this case.

As an initial matter, the ALJ did not explicitly assign a weight to Dr. Steppe's opinion,

which, of course, makes it difficult for the Court to carry out its duty of determining whether

substantial evidence supports the weight assigned. As Plaintiff points out, the ALJ appeared to

credit Dr. Steppe's opinion to some extent, as the ALJ's residual functional capacity assessment

included a sit-stand option and limited standing and walking to 10 to 15 minutes at a time for a total

of two hours. (Tr. 26-27.) Dr. Steppe similarly provided that Plaintiff could stand or walk for 15

minutes at a time for a total of two hours and needed to frequently alternate between sitting and

standing. (Tr. 352.) Yet, the ALJ's residual functional capacity assessment is inconsistent with Dr.

Steppe's opinion in other respects, and it is not clear why the ALJ discredited those portions.

Moreover, several of the factors set forth in 20 C.F.R. § 404.1527(c) favor crediting Dr.

Steppe's opinion, none of which the ALJ indicated that he considered.

First, the ALJ did not summarize Dr. Steppe's treatment notes or otherwise indicate that he credited her three-year treating relationship with Plaintiff and the approximately 30 visits over this period. 20 C.F.R. § 404.1527(c)(2)(I) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Second, although emphasizing the lack of objective evidence, the ALJ did not indicate that he accounted for the examinations and testing that Dr. Steppe did perform: gait (Tr. 272, 283), range of motion, straight leg, and Patrick (Tr. 291-92; *see also* Tr. 306, 319). 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.").

Third, the ALJ did not appear to recognize that Dr. Steppe supplemented her form-opinion with a letter of explanation. 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Fourth, although the ALJ briefly explained how he was accounting for Plaintiff's "anxiety and depression" and "drowsiness" (Tr. 28), he did not explain how he accounted for Dr. Steppe's concentration and production limitations based on her observations of Plaintiff's "fatigue and irritability" (Tr. 353-54). Notably, the seemingly contrary opinion of Tripp, a doctor of education, is not a "medical" opinion authored by an "acceptable medical source." *See* 20 C.F.R. § 404.1513(a); S.S.R. 06-3p, 2006 WL 2329939, at *1-2.

Fifth, the ALJ did not acknowledge the fact that Dr. Qureshi's examination findings of a

21

positive straight-leg test and "painful and limited" movement in the lumbar spine are largely consistent with Dr. Steppe's exam findings. (*Compare* Tr. 201, *with* Tr. 291-92, 306, 319); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Sixth, and most significantly, the ALJ did not explain the significance of Dr. Steppe's opinion being the *only* opinion—medical or otherwise—on Plaintiff's physical limitations. *See* 20 C.F.R. § 404.1527(c)(4), (c)(6); S.S.R. 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). (Although Dr. Qureshi made medical findings, those findings do not specify functional limitations.)

In sum, the ALJ arguably articulated two reasons, one explicit, one implicit, for rejecting Dr. Steppe's opinion. Yet the ALJ's explicit reason for discounting Dr. Steppe's opinion, that it was not supported by the 2009 MRI, is questionable. As for the ALJ's implicit attack on Dr. Steppe's opinion, it is entirely unclear whether the ALJ also implicitly considered and rejected the many reasons for crediting her opinion or whether he simply overlooked those.[2] Collectively, these concerns are considerable and lead this Court to believe that the ALJ did not work through both steps of the treating-source rule. And it is highly unlikely that ALJ's unbalanced critique of Dr. Steppe's opinion makes sufficiently clear to a social-security claimant why the disability-dispositive findings of his long-time physician—findings uncontradicted by any other opinion in the

_____

[2]Although not necessary to support this Court's recommendation to remand, the Court notes that while Plaintiff's treatment history was conservative, and this was in part within his control, Dr. Steppe's opinion was authored in view of this conservative treatment history. A fair inference is that Dr. Steppe concluded that, despite Plaintiff's conservative course of treatment, he was nonetheless limited in the manner set forth in her opinion. The ALJ should consider this possibility on remand.

record—were rejected.  The prudent approach, therefore, is to remand for further explanation.  *See Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 380 (6th Cir. 2013) (concluding that "in the end, a proper analysis of the record might not support giving controlling weight to the opinions of [the treating source].  But this circuit 'has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.'" (quoting *Cole*, 661 F.3d at 939)); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) ("When an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).

The authorities cited by the Commissioner do not demand a different conclusion.  (*See* Def.'s Mot. Summ. J. at 5.)  In *Allen*, the treating source was given medical records pertaining to a period two years before he treated the claimant and was then asked whether "it [was] reasonable to conclude that" the claimant's conditions had existed since that earlier time.  561 F.3d at 648.  The ALJ reasoned that the treating source's affirmative answer was "speculative" since he did not actually treat the claimant during the earlier period.  *Id.* at 651.  The Sixth Circuit noted that the ALJ's rationale, while brief, reached three of the treating-source weighting factors set forth at 20 C.F.R. § 404.1527, including the length, frequency, and nature of the treatment relationship.  *Id*. Here, however, the ALJ's explicit rationale, that the 2009 MRI did not support Dr. Steppe's opinion, only touched  upon one factor, the supportability of her opinion.  Moreover, as the Sixth Circuit recognized in *Allen*, the fact that the treating source was opining on a period during which he provided no treatment was a compelling reason for discounting the treating-source opinion.  As

23

explained, Dr. Steppe personally treated the claimant for three years and the ALJ's reliance on the 2009 MRI was questionable.

The Commissioner also relies on *Bledsoe v. Barnhart*, 165 F. App'x 408 (6th Cir. 2006); there, the Sixth Circuit held that the ALJ's statement that the treating source's opinion was "not well supported by the overall evidence of record" and "inconsistent with other medical evidence of record" was "a specific reason for not affording controlling weight" to the treating-source opinion. *Id.* at 412. But the Court in *Bledsoe* focused on the "controlling weight" inquiry and did not address the ALJ's compliance with the second step of the treating-source analysis. 165 F. App'x at 412. Further, as opposed to this case, in *Bledsoe* there were two medical opinions contrary to that of the treating source, and part of the ALJ's rationale came in the form of crediting their opinions over the treating-source opinion. *Id.*

Least analogous to this case is *Grider v. Comm'r of Soc. Sec.*, No. 2:10-CV-00083, 2011 WL 1125082 (S.D. Ohio Jan. 11, 2011), *report and recommendation adopted*, 2011 WL 1114314 (S.D. Ohio Mar. 25, 2011). There, the treating source opined on an issue reserved to the ALJ and the court found that the treating-source opinion was therefore not entitled to deference. *Id.* at *12. Unlike the physician in *Grider*, Dr. Steppe's functional limitations constitute a medical opinion and do not impermissibly encroach on the ALJ's domain. Further, the court in *Grider* found that "the ALJ's opinion makes clear that he considered the relevant factors, outlined in 20 C.F.R. § 404.1527." *Id.* As discussed, the same is not true in this case.

Accordingly, the Court recommends remand for the ALJ to further explain how much weight he assigned to Dr. Steppe's opinion and his reasons for that weight.

This recommendation renders Plaintiff's remaining arguments presently moot. Plaintiff

argues that the ALJ's residual functional capacity assessment did not account for his limitations in concentration, persistence, or pace. (Pl.'s Mot. Summ. J. at 9-11.) But if the ALJ, upon revisiting Dr. Steppe's opinion, decides to credit her mental-capacity limitations, then the ALJ may also decide to include some concentration-, persistence-, or pace-specific limitations in the residual functional capacity assessment. Indeed, Plaintiff himself states, "the Plaintiff's emotional difficulties, specifically his deficits in CPP, are directly intertwined with the ALJ's error with regard to the evaluation of the medical opinion evidence of record." (*Id.*) Plaintiff also argues that ALJ Roulhac erred in evaluating his credibility. (*Id.* at 11-14.) But because Dr. Steppe's opinion is in accord with, and supports Plaintiff's allegations of disabling pain, the ALJ may also decide to revisit his credibility assessment after providing a more complete analysis of Dr. Steppe's opinion.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ failed to adequately articulate why he rejected the opinion of Shlimon's treating physician, Dr. Terri Steppe. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

Dated:  May 29, 2013

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 29, 2013, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk